UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | |
|---|---|
| -v.- | 16 Cr. 672-1 (KPF) |
| JOSEPH ATUANA, | **ORDER** |
| Defendant. | |

KATHERINE POLK FAILLA, District Judge:

    Defendant Joseph Atuana, who is currently incarcerated at the Metropolitan Detention Center in Brooklyn, New York (hereinafter, the "MDC"), has applied for compassionate release, in the form of immediate release to his family, pursuant to 18 U.S.C. § 3582(c)(1)(A). (Dkt. #179, 182, 189). In brief, Mr. Atuana contends that he is at an increased risk of contracting, or of having a greater reaction to infection from, the COVID-19 virus based on the combination of his pre-existing medical conditions, the conditions of his confinement, and the fact that inmates and staff within the MDC have tested positive for COVID-19. He also cites his rehabilitative efforts while incarcerated. The Government opposes this motion. (Dkt. #184). As set forth in the remainder of this Order, the Court denies Mr. Atuana's motion for compassionate release.

## BACKGROUND

    On September 6, 2016, Mr. Atuana was charged in a criminal complaint with conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349, and aggravated identity theft, in violation of 18 U.S.C. § 1028A. (Dkt. #1). He was arrested two days later, and indicted on fraud, identity theft, and

money laundering charges on October 7, 2016.  (Dkt. #7).  Superseding charging instruments added additional charges and a co-defendant, Ayodele Adeniran, Mr. Atuana's cousin.  (*See* Dkt. #10, 20, 46, 51).  Indictment S4 16 Cr. 672 (the "S4 Indictment"), the operative indictment, charged the two men with conspiracy to commit bank and wire fraud; the substantive offenses of bank fraud, wire fraud, and aggravated identity theft; and conspiracy to commit money laundering; it also charged Mr. Atuana alone with making false statements in a passport application.  (Dkt. #51).

As detailed in the Presentence Investigation Report ("PSR" (Dkt. #149)), "[b]etween approximately April 2012 and 2016, JOSEPH ATUANA and AYODELE ADENIRAN engaged in dozens of separate bank and wire fraud schemes, through which ATUANA and ADENIRAN successfully obtained hundreds of thousands of dollars of funds by defrauding banks, individuals, and corporations."  (PSR ¶ 14).  Mr. Atuana did not object to the factual recitations in the PSR (*see* Transcript of Sentencing Proceedings of April 11, 2019 ("Sent. Tr." (Dkt. #167)) at 8:22-23), and the Court therefore excerpts from the Offense Conduct portion of that report:

> The fraud schemes fell into four separate categories:
>
> a. Bank Account Takeover Scheme: ATUANA and AYODELE stole money directly from the bank accounts of victims by transferring money from the victim bank accounts into bank accounts controlled by the defendants. To effectuate the "account takeover" scheme, ATUANA and ADENIRAN, along with their co-conspirators, would gain access to victims' bank accounts through fraudulent means, and cause money to be transferred from the victims to accounts controlled by ATUANA and ADENIRAN, including through the

> issuance of checks, wire transfers, and automatic debit payments. ATUANA and ADENIRAN received hundreds of thousands of dollars from thousands of individual victims in this way.
>
> b. Forged Checks: ATUANA and ADENIRAN deposited forged checks drawn on victim bank accounts into bank accounts controlled by the defendants. ATUANA and ADENIRAN went into the bank branches themselves in order to deposit the forged checks. ATUANA and ADENIRAN deposited tens of thousands of dollars of checks in this fashion.
>
> c. Fraudulent Emails: ATUANA and ADENIRAN stole money through the use of fraudulent emails. As part of the scheme, emails were sent to businesses and banks. Those emails appeared to be from a particular person whom the recipient knew, such as a company president, or accountant, but, in fact, they were not. These fraudulent emails instructed the email recipients to wire money to business bank accounts that were controlled by ATUANA and ADENIRAN. As a result of this scheme, victims were tricked into sending the defendants hundreds of thousands of dollars.
>
> d. Business Loans: ATUANA and ADENIRAN applied for business loans using forged bank records that they had altered. ATUANA and ADENIRAN attempted to get approximately $669,000 in fraudulent business loans in this fashion.

(PSR ¶ 14). Mr. Atuana and his co-defendant were found to have intended a loss of more than $2 million. (*Id.* at ¶ 15).

After extensive motion practice, both defendants proceeded to trial on the S4 Indictment on January 22, 2018. (Minute Entry for January 22, 2018). After a seven-day trial that involved numerous witnesses and overwhelming testimonial, documentary, and recorded evidence, Mr. Atuana and Mr. Adeniran were convicted on all charges on January 30, 2018. (Dkt. #81). Both defendants engaged in substantial post-trial briefing, in the course of which

they divested themselves of their respective counsel and elected to proceed *pro se*. (Minute Entry for May 3, 2018). At a hearing on July 18, 2018, the Court denied defendants' motions pursuant to Rules 12, 29, and 33 of the Federal Rules of Criminal Procedure. (Minute Entry for July 18, 2018; *see also* Dkt. #128 (transcript of hearing); Dkt. #141-142 (declining previously granted opportunity to file a motion for reconsideration)).

Mr. Atuana was sentenced on April 11, 2019, at a proceeding at which he represented himself but was permitted the assistance of standby counsel. (Minute Entry for April 11, 2019; *see also* Sent. Tr.; Dkt. #159 (judgment)). Prior to the sentencing, the Probation Office had prepared a PSR that included an analysis of Mr. Atuana's exposure under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"); the analysis suggested a Guidelines range of imprisonment of 108 to 135 months, followed by a mandatory consecutive term of imprisonment of 24 months. (PSR ¶¶ 27-54, 94-95). After hearing extensive argument from Mr. Atuana and the Government, the Court sentenced Mr. Atuana principally to concurrent terms of 108 months' imprisonment on each of Counts One, Two, Three, Five, and Six of the S4 Indictment, to be followed by a consecutive term of 24 months' imprisonment on Count Four. (Sent. Tr. 37:24-38:2). The Court explained its sentencing rationale in relevant part as follows:

> [U]nlike many cases that I have had, I've had the ability to spend more time with this case because I sat through a quite extensive trial in the case, and I saw a number of victims, both bank and individuals, who were affected by the conduct that I have adopted from the presentence investigation report.

4

> To the extent that Mr. Atuana is telling me now that there were other people involved, and perhaps even other people involved at higher levels who were perhaps even more critical to this scheme, I have no doubt, and I hope that at some point they will be brought to justice, but I have Mr. Atuana here, and I do not believe that he was unaware of the criminal conduct in which he was engaging.  The sheer number of communications between and among the coconspirators regarding the conduct, the level of care taken to anticipate and prepare for any eventuality, the level of planning, the fact that it persisted over years, and the fact that every time there was, if I may use the expression, a bump in the road, it never caused Mr. Atuana or his colleagues to stop, but only to take the same conduct in a different direction.
>
> And, in particular, the experience with the [New York State] prosecutors in 2014 and telling them that he had no knowledge, only to continue this exact conduct for two more years, is extraordinary to me and does evince knowledge, knowledge, perhaps not of every aspect of the conspiracy, but certainly knowledge of the conduct in which he was involved.
>
> I agree with the government that today, no remorse was shown.  I agree that the conduct was egregious, as it spanned four years, involved numerous victims, whose financial histories and whose personal lives were dramatically and, at times, irrevocably impacted by this.
>
> I have every concern that Mr. Atuana, upon being released from custody, will recidivate, will engage in this conduct again.  I have every reason to believe that both general and specific deterrence are necessary.  And this is one of those rare cases where I believe, as well, that there is something to be said for incapacitation.  If he is out in the world, it is my grave concern that he will immediately revert to this conduct again, and I do not want that to happen.

(*Id.* at 36:10-37:23).

Mr. Atuana appealed from his conviction and sentence, and both were affirmed by the United States Court of Appeals for the Second Circuit in June 2020. *See United States* v. *Atuana*, 816 F. App'x 592 (2d Cir. 2020) (summary order). Later that same month, Mr. Atuana filed a *pro se* motion for compassionate release (Dkt. #179), which was then supplemented by a counseled submission on June 29, 2020 (Dkt. #182). The Government opposed Mr. Atuana's request by letter brief dated July 9, 2020. (Dkt. #184).

Mr. Atuana filed a further counseled supplemental submission on September 14, 2020, advising the Court of his transfer to the MDC and attendant difficulties at that facility. (Dkt. #189). The Court reached out to the legal staff at the MDC on October 20, 2020, and was advised on October 21, 2020, that (i) Mr. Atuana was seen by the MDC medical staff on October 8, 2020, at which time all of his concerns were addressed and (ii) Mr. Atuana will also have a follow-up visit.

## APPLICABLE LAW

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), a court may reduce a defendant's sentence upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant. A defendant may move under § 3582(c)(1)(A) only after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

When considering an application under § 3582(c)(1)(A), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). "The defendant has the burden to show he is entitled to a sentence reduction." *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

Congress previously delegated responsibility to the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(t). The Sentencing Commission has determined that a defendant's circumstances meet this standard, *inter alia*, when the defendant is "suffering from a terminal illness" or a "serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," or if, in the judgment of the BOP, the defendant's circumstances are extraordinary and compelling for "other reasons." U.S.S.G. § 1B1.13(1)(A) & Application Note 1(A), (D). In a recent case, however, the Second Circuit held that with respect to a compassionate release motion brought by a defendant (as distinguished from the BOP), the policy statement set forth in U.S.S.G. § 1B1.13 is "not 'applicable,'" and that

7

neither it nor the BOP's Program Statement constrains a district court's discretion to determine what reasons qualify as "extraordinary and compelling." *United States* v. *Brooker*, — F.3d —, No. 19-3218-cr, 2020 WL 5739712, at *6-7 (2d Cir. Sept. 25, 2020); *see also United States* v. *Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020).[1]  That said, while the Court does not consider itself bound by U.S.S.G. § 1B1.13, it will look to it for guidance.  *See United States* v. *Thrower*, No. 04 Cr. 903 (ARR), 2020 WL 6128950, at *3 (E.D.N.Y. Oct. 19, 2020).

Even if a court determines that "extraordinary and compelling reasons" exist, it must also consider the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable.  *See* 18 U.S.C. § 3582(c)(1)(A); *see also United States* v. *Harris*, No. 15 Cr. 445 (PAE), 2020 WL 5801051, at *2 (S.D.N.Y. Sept. 29, 2020).  In this regard, the Court again looks to, but does not consider itself bound by, the Sentencing Commission's view that a sentence reduction would be consistent with its policy statements if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).[2]

---

[1]  The Second Circuit remanded the matter to the district court after concluding that the lower court had misapprehended the limits of its own discretion.  In so doing, the Court did not define what qualifies as "extraordinary and compelling" under 18 U.S.C. § 3582(c)(1)(A), other than to recall the directive in 28 U.S.C. § 994(t) that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  *United States* v. *Brooker*, — F.3d —, No. 19-3218-cr, 2020 WL 5739712, at *8 (2d Cir. Sept. 25, 2020).

[2]  The § 3142(g) factors are largely duplicative of those in § 3553(a), but also include "whether the offense is a crime of violence" and "the weight of the evidence against the [defendant]." 18 U.S.C. § 3142(g)(1)-(4).

## DISCUSSION

The parties are in agreement that the exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A) has been satisfied. (*Compare* Dkt. #182 at 3-5 ("Mr. Atuana has satisfied the 30-day exhaustion requirement."), *with* Dkt. #184 at 2 n.3 ("The Government agrees that Atuana has exhausted his administrative remedies and that the Court should consider his motion.")). The Court thus proceeds to consider whether Mr. Atuana has identified "extraordinary and compelling reasons" warranting his release, and concludes that he has not.

As noted, Mr. Atuana argues that the conditions of his incarceration at the MDC place him at a higher risk of contracting COVID-19 (or of having a more severe reaction if infected), because of the nature of his confinement at the facility, his existing medical conditions, and the inability of prison staff to handle an outbreak of the virus. The Court recognizes, as do the parties, that sister courts in this District have granted, and denied, compassionate release motions based on the existence of the COVID-19 pandemic and the risks of its transmission at prisons. *See generally United States* v. *Morrison*, No. 16 Cr. 551-1 (KPF), 2020 WL 2555332, at *2 (S.D.N.Y. May 20, 2020); *see also United States* v. *Kerrigan*, No. 16 Cr. 576 (JFK), 2020 WL 2488269, at *3 (S.D.N.Y. May 14, 2020) (collecting cases).

Recognizing the expansive discretion identified by the Second Circuit in *Brooker*, this Court continues to align itself with those courts that have found "that the risks posed by the pandemic alone do not constitute extraordinary and compelling reasons for release, absent additional factors such as advanced

age or serious underlying health conditions that place a defendant at greater risk of negative complications from the disease." *United States* v. *Nwankwo*, No. 12 Cr. 31 (VM), 2020 WL 2490044, at *1-2 (S.D.N.Y. May 14, 2020) (collecting cases); *see also United States* v. *Brady*, No. 18 Cr. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020) ("Instead, compassionate release motions amid the COVID-19 pandemic have required a 'fact-intensive' inquiry, made in the 'unique circumstances' and 'context' of each individual defendant. In practice, courts in this district have considered the age of the prisoner; the severity and documented history of the defendant's health conditions, as well as the defendant's history of managing those conditions in prison; the proliferation and status of infections in the prison facility; the proportion of the term of incarceration that has been served by the prisoner; and the sentencing factors in 18 U.S.C. § 3553(a), with particular emphasis on the seriousness of the offense, the deterrent effect of the punishment, and the need to protect the public." (internal citations omitted)).

Mr. Atuana has not demonstrated the existence of extraordinary and compelling circumstances in his case. Mr. Atuana is 43 years old, which places him at a slightly elevated risk of hospitalization or death from COVID-19. *See* Weekly Updates by Select Demographic and Geographic Characteristics, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex (accessed October 20, 2020). Mr. Atuana adds, however, that he has various comorbidities that exacerbate his risk, including "high blood pressure,

10

hypertension, anxiety, sleeping disorder, eating disorders, eye sight problems, swelling of his joints, and fear of going to bed at night"; his counsel also cites Mr. Atuana's apparent obesity.  (Dkt. #179 at 2; Dkt. #182 at 8-9).

The Centers for Disease Control and Prevention (the "CDC") has recently revised its analysis of comorbidities, distinguishing conditions that place individuals at higher risk with regard to COVID-19, from conditions that *might* place individuals at higher risk, but for which more study is required.  *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (accessed October 20, 2020).  Reviewing the conditions cited by Mr. Atuana and his counsel, only Mr. Atuana's history of high blood pressure and hypertension would fall into the latter category, and his other conditions would not fall into either category.[3]

The Court has reviewed with care Mr. Atuana's BOP medical records, which make clear that Mr. Atuana has worked successfully with BOP medical professionals at multiple facilities, including the MDC, to address his health issues.  *Cf.* CENTERS FOR DISEASE CONTROL AND PREVENTION, People Who Are at Higher Risk for Severe Illness,

---

[3]     The Court agrees with the Government that more recent medical records suggest that Mr. Atuana is overweight but not obese.  (*See* Dkt. #184 at 6-7).

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (accessed October 20, 2020) ("People of all ages with underlying medical conditions, *particularly if not well controlled....*" (emphasis added)). There is nothing to suggest that Mr. Atuana has been unable to care for himself or has been neglected by BOP medical personnel. Instead, Mr. Atuana appears to have received appropriate medical care while incarcerated. *See, e.g.*, *Brady*, 2020 WL 2512100, at *3-4 (acknowledging serious nature of defendant's medical conditions but denying compassionate release where conditions stable and managed in BOP facility); *United States* v. *Garcia*, No. 18 Cr. 802 (CM), 2020 WL 2468091, at *5-6 (S.D.N.Y. May 13, 2020) (denying compassionate release to defendant with asthma, hypertension, and heart conditions housed in facility with 40 documented cases of virus).

Federal courts, including this Court, have been appropriately concerned about the conditions of confinement at federal facilities. *See, e.g.*, *United States* v. *Thaher*, No. 17 Cr. 302-3 (KPF), 2020 WL 3051334, at *5-6 (S.D.N.Y. June 8, 2020), *reconsideration denied*, No. 17 Cr. 302 (KPF), 2020 WL 5202093 (S.D.N.Y. Sept. 1, 2020); *United States* v. *Park*, No. 16 Cr. 473 (RA), 2020 WL 1970603, at *2 (S.D.N.Y. Apr. 24, 2020). To that end, this Court has scrutinized the BOP's Pandemic Influenza Plan, *see* https://www.bop.gov/coronavirus/ (last accessed October 21, 2020), as well as the BOP's listing of confirmed cases among inmates and staff at each facility. As of the date of this Order, the BOP has identified one current case of COVID-19 among inmates at the MDC and three current cases among staff;

12

thirteen inmates and forty-one staff members have recovered from the virus. On balance, this Court concludes that the danger that Mr. Atuana faces from infection with COVID-19, even accounting for his proffered medical conditions, does not amount to an extraordinary and compelling reason for granting compassionate release.  *Cf. United States* v. *Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia.  But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

In his counseled submission, Mr. Atuana also notes the rehabilitative steps he has taken while incarcerated, as well as his education and legitimate employment history.  (Dkt. #182 at 9).  The Second Circuit recognized in *Brooker* that "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason."  2020 WL 5739712, at *8 (emphasis in *Brooker*) (citing 28 U.S.C. § 994(t)).  However, even considered in combination with his other arguments, the Court believes that Mr. Atuana has not demonstrated extraordinary and compelling reasons warranting his immediate release.

Separately, the factors set forth in 18 U.S.C. § 3553(a) counsel against granting Mr. Atuana's motion.  Those factors include "the nature and circumstances of the offense and the history and characteristics of the

13

defendant," as well as the need "to protect the public from further crimes of the defendant."  *See* 18 U.S.C. § 3553(a)(1), (a)(2)(C).  As made clear in its sentencing rationale, the Court remains concerned that Mr. Atuana, who has neither shown remorse nor accepted responsibility for his trove of criminal conduct, is a significant risk of recidivism.  For four years, Mr. Atuana engaged in dozens of fraudulent schemes, resulting in millions of dollars in actual and intended losses to scores of people and companies.  Mr. Atuana and his co-conspirators infused their conduct with religiosity, suggesting that successfully defrauding others reflected divine intervention, or at least, divine approval of their undertakings.  And four years after his arrest, nearly three years after his conviction, and one year after his sentencing, Mr. Atuana has displayed not one bit of remorse.  Accordingly, even if the Court had found extraordinary and compelling circumstances on the facts presented, which it has not, it would deny Mr. Atuana's application based on its contemporaneous consideration of the § 3553(a) factors.[4]

---

[4]  To the extent that he has not otherwise done so, Mr. Atuana can pursue relief in the form of a furlough under 18 U.S.C. § 3622 or home confinement as contemplated in the CARES Act, Pub. L. No. 116-136 (2020), and the Attorney General's April 3, 2020 memorandum to the BOP.  The decision to grant any such relief, however, is reserved to the discretion of the BOP.

## CONCLUSION

For the foregoing reasons, Defendant Joseph Atuana's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is DENIED. The Clerk of Court is directed to terminate the motions at docket entries 182, 185, and 189.

SO ORDERED.

Dated:   October 22, 2020
        New York, New York

                                         KATHERINE POLK FAILLA
                                         United States District Judge